# Supreme Court of Texas

No. 20-0552

S.C.,

*Petitioner*,

v.

M.B., Individually and as Next Friend of I.C.,

*Respondent*

On Petition for Review from the
Court of Appeals for the Second District of Texas

**Argued December 1, 2021**

JUSTICE YOUNG delivered the opinion of the Court, in which Chief Justice Hecht, Justice Lehrmann, Justice Devine, Justice Blacklock, and Justice Huddle joined.

JUSTICE BLAND filed a dissenting opinion, in which Justice Boyd and Justice Busby joined.

One principal function of a final divorce decree is to divide a couple's community property. Sometimes, however, the decree may not divide *all* the community property. When that happens, it stops being *community* property because the marriage has ended. But both spouses continue to own it as tenants in common, just as they could jointly own property with anyone else. Any tenant in common who wishes to divide

property may seek a partition under Property Code § 23.001. A Property Code partition presumes an even split; in a divorce, by contrast, a judge uses a "just and right" standard to divide community property. For most of Texas history, if property escaped division in divorce, partitions were the *only* way that courts could divide it for the former spouses.

But in 1987, the legislature enacted a statute (now codified as Subchapter C of Chapter 9 of the Family Code) that creates a new option for former spouses: using the "just and right" standard even *after* divorce. This case requires us to decide whether Subchapter C does more than create that new remedy. Does it also make the new remedy the *exclusive* remedy and vest exclusive jurisdiction over that remedy in the original divorce court?

The answer is no. Absent a clear showing to the contrary, we presume that statutes do not entail such jurisdictional consequences. Express language or necessary implication can overcome that presumption, but neither does so here. The Family Code repeatedly uses unambiguous language like "exclusive jurisdiction"—but not in Subchapter C. Nor does any other text or context warrant converting Subchapter C from an important remedial expansion into a jurisdictional limitation.

When Subchapter C applies and is invoked, however, it provides the rule of decision. If either former spouse prefers the "just and right" standard, Subchapter C supplies it. We hold only that the statutory text does not force former spouses to that choice or impose any jurisdictional restrictions. We therefore affirm the judgment of the court of appeals.

**I**

The parties in this case divorced in December 2013. S.C. (the

2

husband) and M.B. (the wife) negotiated a mediated settlement agreement, which became an "agreement incident to divorce" that settled various issues, including how to divide community property listed on an inventory prepared by S.C. The divorce court incorporated that agreement into the final divorce decree.

S.C.'s inventory, however, excluded partnership interests in four real-estate deals, which were community property.[1] No one alleges anything nefarious about that exclusion. Far from concealing the partnerships, S.C. transparently identified them as incomplete deals that, when completed, would become part of the community estate. The inventory was finalized before the deals closed, so the deals were not added to the inventory. Because the property was left off the inventory, it was also outside the parties' agreement incident to divorce, and thus was excluded from the final divorce decree.

After the divorce, disputes concerning it arose between the former spouses. M.B. sued S.C. in Tarrant County civil district court, but not the court that had granted the divorce. She alleged various claims that are not before us,[2] and eventually asked the court to partition the property represented by the real-estate deals. She invoked the general cause of action for partition provided in Property Code § 23.001.

---

[1] S.C. did not challenge the existence of jurisdictional facts. We thus take as true the pleaded facts about the property division in M.B.'s live petition, including that the property interests at issue were community property that could have been but were not divided by the divorce court. *See, e.g.*, *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226 (Tex. 2004). We do not resolve whether the allegations are true or address any merits questions about the nature of these parties' interests. We leave all such issues to the district court in the first instance.

[2] The initial claims included, for example, breach of the settlement agreement and breach of a partnership agreement.

S.C. filed a plea to the jurisdiction and pointed to Subchapter C of Chapter 9 of the Texas Family Code as support.[3] That statute, enacted in 1987, provides an alternative to a traditional partition for former couples who wish to divide marital property that they still jointly own. When Subchapter C applies, "[e]ither former spouse" may bring the cause of action that it creates. Tex. Fam. Code § 9.201(a).[4] Subchapter C requires "the court [to] divide the property in a manner that the court deems just and right, having due regard for the rights of each party and any children of the marriage." § 9.203(a). According to S.C., Subchapter C did not merely provide a *new* remedy, but also eliminated the *old* remedy of partition. S.C. argued that Subchapter C now provides the exclusive remedy to divide property that went undivided in divorce—and, moreover, it gave the original divorce court exclusive jurisdiction to perform that division.[5]

The district court agreed with S.C. that it had no jurisdiction over M.B.'s partition action and thus granted S.C.'s plea to the jurisdiction. M.B. moved to certify a permissive interlocutory appeal of that order

---

[3] Tex. Fam. Code §§ 9.201–9.205.

[4] Unless otherwise indicated, all further statutory references are to the Texas Family Code as currently codified.

[5] In this opinion, "undivided property" refers—as Subchapter C itself refers—to property that *before* divorce was community property but was *not* divided in divorce. *See, e.g.*, § 9.201(a) ("to divide property not divided"); § 9.203 (titled "Division of Undivided Assets When Prior Court Had Jurisdiction"). But community property does not survive a divorce decree *as community property*. *See infra* at 8. Rather, each spouse has an undivided separate—*not* community—property interest, at least until a court eventually divides it.

4

under Civil Practice and Remedies Code § 51.014(d).[6] S.C. did not oppose the certification, which the district court granted and the court of appeals accepted.[7] Over Chief Justice Sudderth's dissent, the court reversed, concluding that Subchapter C did not divest the district court of jurisdiction over M.B.'s partition action. 634 S.W.3d 102 (Tex. App.— Fort Worth 2020). We granted S.C.'s petition for review.

## II

The central issue before us is whether Subchapter C supplements or instead supplants the remedial options available to former spouses who wish to divide property that went undivided in divorce. S.C. seeks reversal on the ground that the legislature has made Subchapter C the exclusive remedy for such former spouses, thus eliminating their access to the preexisting partition remedy, and that the original divorce court is their exclusive forum.

The legislature has broad authority to displace existing remedies and to restrict district courts' subject-matter jurisdiction. Such limitations need not be express, but "[w]e resist classifying a provision

---

[6] The authorization for a permissive interlocutory appeal "does not apply to an action brought under the Family Code." Tex. Civ. Prac. & Rem. Code § 51.014(d-1). Because M.B.'s claim was brought under the Property Code, this limitation does not apply, and we have no further cause to opine about the scope of the limitation.

[7] By proceeding under § 51.014, the parties and both lower courts facilitated our review of the purely legal question presented. Because they followed the procedure to allow interlocutory appeals, the case came to us quickly and unburdened by a complex record that would inevitably have grown if the case had to proceed to a final judgment before being appealed. We therefore can address the issue presented expeditiously and efficiently. This posture is precisely the pathway that the legislature envisioned by enacting § 51.014(d)–(f), and we reaffirm what we have said before: that the lower courts should make use of this procedural vehicle when appropriate. *See Sabre Travel Int'l Ltd. v. Deutsche Lufthansa AG*, 567 S.W.3d 725, 732–33 (Tex. 2019).

5

as jurisdictional absent clear legislative intent to that effect." *Crosstex Energy Servs., L.P. v. Pro Plus, Inc.*, 430 S.W.3d 384, 391 (Tex. 2014). Absent a compelling showing to the contrary, we presume that remedies remain intact and that the jurisdiction of a district court—our state's sole court of general jurisdiction—remains undisturbed. *See, e.g.*, Tex. Const. art. V, § 8; *In re Oncor Elec. Delivery Co.*, 630 S.W.3d 40, 44 (Tex. 2021). As the U.S. Supreme Court recently put it, "[w]here multiple plausible interpretations exist—only one of which is jurisdictional—it is difficult to make the case that the jurisdictional reading is clear." *Boechler, P.C. v. Comm'r*, 142 S. Ct. 1493, 1498 (2022). Even a reading that is "better is not enough. To satisfy the clear-statement rule, the jurisdictional condition must be just that: clear." *Id.* at 1499.

The legislature has reaffirmed the reach of district courts' purview, *see* Tex. Gov't Code §§ 24.007–24.008, including emphasizing that family district courts do "not limit the jurisdiction of other district courts nor relieve them of responsibility for handling cases involving family law matters." *Id.* § 24.601(c). Against this backdrop, "all claims are presumed to fall within the jurisdiction of the district court unless the Legislature or Congress has provided that they must be heard elsewhere." *Dubai Petroleum Co. v. Kazi*, 12 S.W.3d 71, 75 (Tex. 2000).

Subchapter C's text does not expressly direct that its remedy be exclusive or vest the original divorce court with exclusive jurisdiction over post-divorce property divisions. To determine whether Subchapter C imposes remedial or jurisdictional exclusivity by implication, we examine Subchapter C's operation in the larger context of how Texas law treats community property that went undivided in a final divorce.

In other words, this case turns purely on statutory construction.

6

We examine the legal background to ascertain what the legislature changed (and left unchanged), assess how Subchapter C affects the legal landscape, and then determine whether and to what extent the new statute abrogated rather than merely supplemented existing law.

**A**

We begin with the legal consequences that follow when divorce decrees fail to divide community property. Community property exists solely within a marriage and cannot survive divorce. *See Busby v. Busby*, 457 S.W.2d 551, 554 (Tex. 1970); *Cameron v. Cameron*, 641 S.W.2d 210, 223 (Tex. 1982) ("Community property owes its existence to the legal fact of marriage . . . ."); *accord Schlueter v. Schlueter*, 975 S.W.2d 584, 588 (Tex. 1998). Instantly upon divorce, therefore, our law transforms the former spouses into "tenants in common in the property or joint owners thereof, just as if they had never been married." *Taylor v. Catalon*, 166 S.W.2d 102, 104 (Tex. 1942) (citing *Kirkwood v. Domnan*, 16 S.W. 428, 429 (Tex. 1891)). Terminology about property interests has at times been imprecise, but tenancy in common is the correct characterization of ownership for undivided community property.[8] The legislature is free to alter this default rule either in general or for specific types of property.

Allowing community property to become a tenancy in common by

---

[8] We often repeat that former spouses "become tenants in common or joint owners" of community property not divided in a divorce decree. *See, e.g.*, *Busby*, 457 S.W.2d at 554; *Taylor*, 166 S.W.2d at 104; *Jenkins v. Volz*, 54 Tex. 636, 639 (1881). We have also used joint ownership "to refer both to property held in joint tenancy, and property held in cotenancy." *Laster v. First Huntsville Props. Co.*, 826 S.W.2d 125, 129 (Tex. 1991) (citing *Stauffer v. Henderson*, 801 S.W.2d 858 (Tex. 1990), and *Harrell v. Harrell*, 692 S.W.2d 876 (Tex. 1985)). Tenancy in common and joint tenancy, however, are distinct types of ownership. *Id.* at 128–29.

default is rarely the best option. Spouses who have chosen to terminate their marriage are unlikely to benefit by becoming tenants in common. But as Subchapter C's very existence confirms, the legislature pragmatically recognizes that, for good or ill, community property sometimes *will* escape division in divorce. Examples abound from our state's earliest days, when divorce was far rarer than today.[9]

*Kirkwood*, which addressed the consequences of an 1882 divorce, provides a good illustration. Much like today, Texas law then provided "that 'the court pronouncing a decree of divorce from the bonds of matrimony shall also decree and order a division of the estate of the parties in such a way as to the court shall seem just and right, having due regard to the rights of each party' . . . ." *Kirkwood*, 16 S.W. at 429 (quoting Rev. Stat. art. 2864). Yet the couple divorced *without* a "just and right" division of their real property in Waco. By operation of the default rule, then, "the former husband and wife stood towards each other, after the decree of divorce, as if they had never borne that relation to each other. They then owned the property as tenants in common, and subject to all the rules and regulations of strangers" who jointly owned property. *Id.* In a later partition suit, the district court rendered a decree directing the land sold and the sale proceeds equally divided. *Id.* This Court upheld that equal division. *Id.*

Instances of this default rule transforming community property to a tenancy in common after a divorce were frequent and remain so today. *E.g.*, *Harrell v. Harrell*, 692 S.W.2d 876, 876 (Tex. 1985); *Busby*,

---

[9] *See, e.g.*, *Wright v. Wright*, 7 Tex. 526 (1852); *Ellis v. Rhone*, 17 Tex. 131 (1856); *Hardin v. Hardin*, 38 Tex. 616 (1873); *Whetstone v. Coffey*, 48 Tex. 269 (1877).

8

457 S.W.2d at 554; *Keller v. Keller*, 141 S.W.2d 308, 311 (Tex. [Comm'n Op.] 1940); *Evans v. Jones*, No. 11-19-00008-CV, 2020 WL 7414162, at *3 (Tex. App.—Eastland Dec. 18, 2020, no pet.). Frequency, however, does not connote desirability. We pointedly observed in *Busby* that, although a partition action resulted in dividing property in half, we "strongly suspect[ed]" that the divorcing court "would not have divided" the property that way. 457 S.W.2d at 551, 555. To help prevent application of the default rule through inadvertence, we urged that, "[i]n the future, counsel for litigants in divorce suits should call to the attention of the trial judge all of the assets of the marriage," and, "especially in suits where one of the parties is not represented by counsel," we directed divorce courts to "inquire as to the existence of insurance or retirement programs to the end that the final judgment fully disposes of all property valuables of the community." *Id.* at 555.

Our cautionary language in *Busby* targeted *unintended* omissions from a final decree. Of course, parties might choose with their eyes wide open to continue to own property jointly. If for personal or business reasons they prefer to be transformed into tenants in common upon divorce (and prefer this result to follow from operation of law rather than as part of a final decree), Texas courts will not force them to do otherwise.

Beyond inattention or informed choice, however, a third and darker reason explains why some property goes undivided. Divorce can summon forth the worst versions even of good people. One temptation for a soon-to-be-former spouse is to hide property from the other and from the court, or at least to be less than forthcoming about it. Ideally, the innocent spouse will nonetheless discover the property before the divorce proceedings become final, thus preventing the default rule from

9

taking effect (and perhaps causing the divorce court to view the other spouse with a jaundiced eye). But otherwise, the only way to obtain a "just and right" division of the property *after* divorce was through a bill of review that could set aside the former judgment by establishing extrinsic fraud (whereas intrinsic fraud would be insufficient). *See, e.g.*, *Montgomery v. Kennedy*, 669 S.W.2d 309, 313 (Tex. 1984) (extrinsic fraud for bill of review).[10]

Whatever the reason—inadvertence, a knowing decision, or some form of concealment—the former spouses become, in the eyes of the law, just two unrelated people who jointly own property. We have never suggested that the courts themselves could or should change that underlying law.

For most of our history, such former spouses were limited to the same remedy as any other tenants in common who wished to divide property: a partition action, which is currently codified in Property Code § 23.001. Partitions presume an even split, subject to accounting. For instance, if one spouse paid costs associated with maintaining or improving the property in which the other tenant in common had not shared, the division of the property would ensure that the spouse that covered the costs fully recouped that investment. *See, e.g.*, *Cox v.*

---

[10] Fraud is intrinsic when it involves merits issues that can be ferreted out in litigation. *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 752 (Tex. 2003). This includes some rather despicable behavior like perjury, using fraudulent evidence, and hiding evidence. *Id.* On the other hand, fraud is extrinsic when it denies a party the opportunity to litigate its claim or defenses because of actions outside the court proceedings. *See Tice v. City of Pasadena*, 767 S.W.2d 700, 702 (Tex. 1989); *see also, e.g.*, *PNS Stores, Inc. v. Rivera*, 379 S.W.3d 267, 276 (Tex. 2012) ("[Plaintiff's] failure to provide the clerk with [default judgment defendant]'s last known address, which [Plaintiff] knew, is some evidence of extrinsic fraud.").

*Davison*, 397 S.W.2d 200, 202 (Tex. 1965); *Sayers v. Pyland*, 161 S.W.2d 769, 771–72 (Tex. 1942); *Bowman v. Stephens*, 569 S.W.3d 210, 222 (Tex. App.—Houston [1st Dist.] 2018, no pet.).

Partition actions, moreover, are subject to the parties' jury-trial right. *See, e.g.*, *Payne v. Benham*, 16 Tex. 364, 369–70 (1856); *Azios v. Slot*, 653 S.W.2d 111, 112–14 (Tex. App.—Austin 1983, no writ). The jury may resolve factual questions about whether someone was a tenant in common; the legitimate amount of accounting associated with dividing the property; and other factual disputes. *Payne*, 16 Tex. at 369–70; *Burton v. Williams*, 195 S.W.2d 245, 247–48 (Tex. Civ. App.—Waco 1946, writ ref'd n.r.e.); *Bouquet v. Belk*, 376 S.W.2d 361, 362–63 (Tex. Civ. App.—San Antonio 1964, no writ).

Typically, there is no statute of limitations for a partition, although adverse possession may apply, which poses another important question that could require a jury's input. *Hanrick v. Gurley*, 54 S.W. 347, 355 (Tex. 1899) (no limitations for partition action); *see also McLaren v. Beard*, 811 S.W.2d 564, 568–69 (Tex. 1991) (discussing jury charge in post-partition adverse-possession suit).

**B**

Until 1987, the foregoing discussion was the sum and substance of the general law concerning community property that went undivided in divorce. The legislature then enacted a statute that created a new option, in specified circumstances, to divide property not divided by a divorce decree.[11] The statute, now codified as Subchapter C of Chapter 9

---

[11] *See* Act of July 20, 1987, 70th Leg., 2d C.S., ch. 50, § 3, 1987 Tex. Gen. Laws 160. That statute was originally codified as Texas Family Code § 3.90 *et seq*.

of the Family Code,[12] created a new mechanism in which a former spouse could invoke the courts' authority to divide as-yet-undivided property under the same "just and right" standard that applies in divorce. Its provisions do the following:

- Section 9.201 creates the cause of action, which it describes as a "procedure for division of certain property not divided on divorce or annulment." Under its authority, "[e]ither former spouse may file a suit" that "is governed by the Texas Rules of Civil Procedure applicable to the filing of an original lawsuit." § 9.201(a), (b).

- Section 9.202 creates a statute of limitations. The lawsuit described in § 9.201 may not be brought more than two years after "a former spouse unequivocally repudiates" the other spouse's interest. § 9.202(a).

- Section 9.203 prescribes the substantive rules for the new suit, depending on whether the divorce was in Texas or elsewhere. For Texas divorces, "[i]f a court of this state failed to dispose of property subject to division in a final decree . . . even though the court had jurisdiction over the spouses or over the property, the court shall divide the property in a manner that the court deems just and right . . . ." § 9.203(a).

- Section 9.204 provides rules for both Texas and out-of-state divorced couples where the divorce court lacked jurisdiction. For Texas divorces, "[i]f a court of this state failed to dispose of property . . . because the court lacked jurisdiction over a spouse

_____

[12] The legislature later reorganized the Family Code in what it deemed a "non-substantive recodification," Act of April 17, 1997, 75th Leg., R.S., ch. 7, § 1, 1997 Tex. Gen. Laws 8, which led to the statute's current codification.

or the property, and if that court subsequently acquires the requisite jurisdiction, that court may divide the property in a manner that the court deems just and right . . . ."  § 9.204(a).

- Section 9.205 authorizes attorney's fees.

At its core, Subchapter C allows property that is no longer community property to be treated by a court as if it still were, so that it can be divided by the just-and-right standard.  But the statute did not actually change the nature of the ownership interest of the property.  Subchapter C did not displace the iron rule that "[c]ommunity property not awarded or partitioned by a divorce decree is subject to later partition between the ex-spouses, *who are considered joint tenants or tenants in common.*"  *Wilde v. Murchie*, 949 S.W.2d 331, 332 (Tex. 1997) (emphasis added); Joseph W. McKnight, *Family Law: Husband and Wife*, 42 Sw. L.J. 1, 48 (1988) ("[T]he parties would still hold property as tenants in common.  Thus, part of the *Busby* rule subsists.") (footnote omitted).[13]

---

[13] If, as the dissent says, Subchapter C abrogated over a century of law so that former spouses do *not* become tenants in common of community property that went undivided in a final decree, two significant consequences would follow.  First, it would mean the legislature took away a rule of property classification without replacing it with anything.  The dissent does not fill the gap that its reading creates; our reading leaves no gap to fill.  Second, it would be tantamount to abrogating the Property Code right to partition long recognized at common law, leading to further problems.  *See infra* Part II.D.  Wholly aside from the legislature's *power*, "[w]e have consistently declined to construe statutes to deprive citizens of common-law rights unless the Legislature *clearly* expressed that intent."  *ConocoPhillips Co. v. Koopmann*, 547 S.W.3d 858, 877 (Tex. 2018) (quotation omitted) (emphasis added).

But that clarity, if the dissent were right, has gone unnoticed for many decades.  As far as we can tell, not one appellate justice in Texas before this case has thought that Subchapter C changed the law in which former spouses become tenants in common of community property that goes undivided in a

Likewise, the new statute does not allow anyone to relitigate issues already resolved by the final divorce decree. Subchapter C does not create "a legislatively endorsed exception to the finality of the final divorce decree." *Post* at 10 (Bland, J., dissenting). The statute authorizes no collateral attack on closed and final divorce decrees. As we repeatedly have held, "[a] judgment finalizing a divorce and dividing marital property bars relitigation of the property division, even if the decree incorrectly characterizes or divides the property." *Pearson v. Fillingim*, 332 S.W.3d 361, 363 (Tex. 2011) (citing *Reiss v. Reiss*, 118 S.W.3d 439, 443 (Tex. 2003), and *Baxter v. Ruddle*, 794 S.W.2d 761, 762–63 (Tex. 1990)). Thus, if a divorce court with jurisdiction grants a final decree that addresses property, nothing in Subchapter C provides any escape

final decree. Indeed, before this case, only one justice has even shared the dissent's view on Subchapter C's exclusivity as a remedy—and *even he* did not question that former spouses become tenants in common of community property that went undivided in divorce. *See Phillips v. Phillips*, 951 S.W.2d 955, 958 (Tex. App.—Waco 1997, no pet.) (Vance, J., concurring).

Nor is it a matter of there having been little opportunity to opine. From Subchapter C's enactment until today, Texas lower courts have recognized the principle over and over and over. *See, e.g.*, *Sutton v. Green*, No. 14-01-01043-CV, 2002 WL 1489347, at *2 (Tex. App.—Houston [14th Dist.] July 11, 2002, no pet.) (Guzman, J.). We cite a small fraction of those cases solely to illustrate the extraordinary prevalence and persistence—*after* Subchapter C's enactment—of the principle that former spouses become tenants in common of undivided property: *Johnson v. Dunham*, No. 11-20-00123-CV, 2022 WL 969516, at *9 (Tex. App.—Eastland Mar. 31, 2022, no pet.); *Kadlecek v. Kadlecek*, 93 S.W.3d 903, 906 (Tex. App.—Austin 2002, no pet.) (Yeakel, J.); *Phillips*, 951 S.W.2d at 957; *Burgess v. Easley*, 893 S.W.2d 87, 90 (Tex. App.—Dallas 1994, no writ); *In re Marriage of Moore*, 890 S.W.2d 821, 839 (Tex. App.—Amarillo 1994, no writ).

Even the Court of Criminal Appeals has relied upon this principle, *Chiarini v. State*, 442 S.W.3d 318, 320 n.14 (Tex. Crim. App. 2014), and so have at least three federal cases (including one just last year): *In re Owsley*, No. 2:20-CV-00171, 2021 WL 3033120, at *10 (S.D. Tex. July 17, 2021); *In re Mugica*, 362 B.R. 782, 786 n.1 (S.D. Tex. 2007); *In re Finch*, 130 B.R. 753, 756 (S.D. Tex. 1991).

from the rule that a wrongful division can be challenged only by appeal. "Res judicata applies to a final divorce decree just as it does to any other final judgment, barring subsequent collateral attack even if the divorce decree improperly divided the property. . . . The trial court may not change the decree's division of property even if it contains substantive legal error." *Brown v. Brown*, 236 S.W.3d 343, 348 (Tex. App.—Houston [1st Dist.] 2007, no pet.) (Bland, J.); *see also Hagen v. Hagen*, 282 S.W.3d 899, 907 (Tex. 2009) (likewise noting the impropriety of collateral attacks on final decrees). Section 9.007(b) expressly mandates this result.[14]

Subchapter C does not deviate from that principle. It instead allows property *that was never divided* to be divided *for the first time.* The only way to *re*divide property, in other words, is by bill of review—which amounts to saying that the original division never really happened because the court lacked jurisdiction. *See, e.g.*, *Browning v. Placke*, 698 S.W.2d 362, 363 (Tex. 1985).

The dissent, by contrast, reads Subchapter C as something like a liberalized bill-of-review procedure that provides an exception to this no-collateral-attack rule. *See post* at 11–12. Thus, the dissent says, the statute "limit[s] where and how parties may assert a *challenge to a final divorce decree.*" *Id.* at 12 (emphasis added). Indeed, the dissent's approach

---

[14] We certainly do not disagree, therefore, with the principle that the dissent derives from *Koepke v. Koepke*, 732 S.W.2d 299, 300 (Tex. 1987)—that "a divorce decree is a final judgment, and that '[o]mission of certain community property from a divorce decree does not affect its finality.'" *Post* at 10 n.22. Exactly so—Subchapter C would not exist if courts *could* reopen the original decree and redivide the whole community estate. Such a regime would be disastrous, which is why we take pains to note that neither Subchapter C nor Property Code § 23.001 could affect the original property division.

15

would unquestionably open judgments to collateral attack.[15]   We respectfully disagree with that characterization because Subchapter C authorizes *no* attack—direct, collateral, or otherwise—on *any* final divorce decree, including here.

Thus, the dissent's view of this litigation—as a suit that actually sought to "modify an in-state divorce," *id.*—is also mistaken.  Such a suit would fail because it would be an impermissible collateral attack.  Said another way, if M.B. *did* seek to attack, modify, or otherwise disturb the finality of the divorce decree, the answer would not be to send her to the original divorce court—it would be to bar her claim in *every* court under *res judicata*.[16]

---

[15] Threats to finality would follow from the *dissent's* insistence on imposing jurisdictional consequences on Subchapter C, which would ensure that void judgments are lingering in the world.  After all, Subchapter C applies to *all divorce decrees ever rendered*.  The original version of Subchapter C enacted in 1987 was prospective.  *See* Act of July 20, 1987, 70th Leg. 2d C.S., ch. 50, § 7, 1987 Gen. Laws 160, 161.  But the legislature later extended it to "decrees of divorce and annulment rendered before, on, or after November 1, 1987."  Act of May 26, 1989, 71st Leg., R.S., ch. 371, § 10, 1989 Tex. Gen. Laws 1462, 1466.

We know of at least one division that is subject to collateral attack under the dissent's approach: *Mayes v. Stewart*, 11 S.W.3d 440 (Tex. App.—Houston [14th Dist.] 2000, pet. denied) ("Mrs. Stewart filed the current lawsuit in the 11th District Court, while the Stewarts' divorce action was tried in the 245th District Court." (footnote omitted)), *disapproved of on other grounds by Agar Corp., Inc. v. Electro Cirs. Int'l, LLC*, 580 S.W.3d 136 (Tex. 2019).  We cannot know how many more there would be.  It never before mattered, so it often is not apparent on the face of an appellate opinion if the divorcing court and the Subchapter C court were different.  Many judgments, too, are not appealed—including possible amicable partitions that presumably would be open to collateral attack if one party later regrets the decision.

[16] We addressed this issue recently in *Loya v. Loya*, 526 S.W.3d 448 (Tex. 2017).  The trial court there granted summary judgment for the husband because the divorce decree *did* contemplate and partition a future employment bonus.  *Id.* at 450.  The court of appeals, citing § 9.201(a), determined that there

16

But M.B. requests modification of nothing.  She asks the court to divide *for the first time* property that has *never* been addressed by *any* court.  S.C. is the one who filed a plea to the jurisdiction; his plea assumes that the property was not divided by the divorce decree.[17]  Accordingly, we must assume that the final decree said *nothing* that constitutes a division of the property at issue.

Subchapter C, in short, provides no mechanism to *disturb* finality, but instead provides a way to *establish* finality for a property that was never subject to a decree.  Once divided, that property, too, would be subject to the law of preclusion, and any attempt to redivide it would be barred by *res judicata*.

## C

The question now before us is whether Subchapter C went further than creating a new remedy.  Subchapter C *allows* a divorced couple to

---

was "a fact issue concerning the characterization of the bonus." *Loya v. Loya*, 473 S.W.3d 362, 366 (Tex. App.—Houston [14th Dist.] 2015).  We reversed and rendered for the husband because the mediated settlement agreement *had* contemplated the bonus—and had awarded it to the husband, making a collateral attack impermissible.  526 S.W.3d at 452–53.  We have repeatedly addressed variations on this theme.  *See, e.g.*, *Pearson*, 332 S.W.3d at 364 (*res judicata* prevents relitigating property division when a residuary clause had divided the property); *Reiss*, 118 S.W.3d at 443 (*res judicata* prevents relitigating property division when divorce decree had mischaracterized separate property as community property); *Shanks v. Treadway*, 110 S.W.3d 444, 449 (Tex. 2003) (*res judicata* prevents relitigating property division even though the divorce decree had improperly divided retirement benefits).

[17] Notably, the agreement incident to divorce incorporated into the divorce decree is not even in the record before us.  We need not—indeed should not—speculate or prejudge any merits issue that is properly left in the first instance to the district court on remand.  Such issues include the final characterization of S.C.'s and M.B.'s respective interests (if any) in the disputed property and whether Property Code § 23.001 may reach the kind of property at issue.  We instead resolve only the jurisdictional question that is presented.

17

use the "just and right" standard to divide property that went unaddressed by a final divorce decree. Does it also unequivocally *disallow* access to any Texas court other than the original divorce court and *prohibit* use of the partition action itself? We conclude that the statutory text, within its larger context, warrants no such findings of exclusivity.

**1**

First, the new cause of action tells the former spouses that they "may file a suit" that asks a court to divide their tenancy in common. § 9.201(a). That new suit is truly a new suit, not a continuation of the divorce: any new "suit is governed by the Texas Rules of Civil Procedure applicable to the filing of an original lawsuit." § 9.201(b). The new cause of action has its own statute of limitations and its own standard for tolling. § 9.202. The plain import of this language is to offer a new remedy that parties seeking to divide property "may" invoke, subject to Subchapter C's particular requirements. Nothing in the text indicates that the choice is, in effect, either to use this new method to divide the property or to not divide it at all. *Cf., e.g.*, Tex. Lab. Code § 408.001 ("Recovery of workers' compensation benefits is the exclusive remedy . . . ."). At minimum, nothing in the text suggests that, even if both parties prefer the Property Code partition, the legislature nonetheless has forbidden access to that remedy.

The dissent focuses less on "may file" in § 9.201(a) than on "shall divide" in § 9.203(a). We agree, of course, that "'[s]hall' is mandatory language." *Post* at 8. But the mandatory standard of § 9.203(a) comes into play only once a non-mandatory suit under § 9.201(a) is filed. Regardless, the commonly used verb "shall" does not clearly convey

18

exclusive jurisdiction. The direction that "the court *shall* divide the property in a manner that the court deems just and right," § 9.203(a) (emphasis added), plays a different role. First, "shall" unambiguously ensures that the court must use the just-and-right standard, and nothing else (such as those used in Property Code partitions). Especially when the statute was new, such clarity may have been especially important—until then, all former community property that had gone undivided would have been subject only to a Property Code partition by former spouses who had become tenants in common. Second, as we discuss below, the emphatic "shall" confirms that if *either* party invokes Subchapter C, the just-and-right standard must—*shall*—apply.

In any event, "just because a statutory requirement is mandatory does not mean that compliance with it is *jurisdictional*." *Albertson's, Inc. v. Sinclair*, 984 S.W.2d 958, 961 (Tex. 1999) (emphasis added). We find nothing in the verbs of § 9.201 or § 9.203 to dislodge the presumption of jurisdiction.

**2**

Second, the larger context of the Family Code confirms the significance of Subchapter C's lack of express language regarding exclusivity, whether for Subchapter C (as opposed to partitions) or the original divorce court (as opposed to another court). Elsewhere, the Family Code repeatedly and unambiguously vests "continuing and exclusive jurisdiction" in family courts over a host of matters.[18] In fact, the Family Code uses the phrase "exclusive jurisdiction" or some

---

[18] *E.g.*, §§ 34.004(b)(3), 34.008(c)(3)(A), 51.04(a), 65.004(b) ("exclusive original jurisdiction"), 152.202 ("exclusive continuing jurisdiction"), 155.001(a), 159.205(a), 159.211(a), 160.758 ("continuing, exclusive jurisdiction").

variation over a hundred times in at least fifty-five provisions, not counting the ten instances where it appears in a section's title.[19]

Accordingly, the utter *absence* of any express language of exclusivity is especially telling in the Family Code context. We certainly agree with the dissent that "[n]o magic words are necessary . . . when the context plainly indicates that the statute creates" exclusive jurisdiction. *Post* at 9. But the context here is a Code in which the legislature repeatedly uses *some* version of "exclusive jurisdiction" when exclusivity is what it wants. We would ignore that context if we dismissed the legislature's decision to omit remotely comparable language here. *See, e.g., Crosstex*, 430 S.W.3d at 392 ("[O]ur aversion to classifying statutory requirements as jurisdictional prevents such classification absent a clear indication from the Legislature of jurisdictional intent. For instance, the Legislature chose to make certain filing deadlines in the Labor Code jurisdictional with unequivocal language.") (citations omitted).

The absence of any such language anywhere in Subchapter C is particularly conspicuous. After all, its immediate neighbor—Subchapter B, for qualified domestic relations orders—is unambiguous: "Notwithstanding any other provision of this chapter, the court that rendered a final decree of divorce or annulment or another final order

---

[19] The *Government* Code supplies one reason that the legislature so readily uses the language of exclusivity in the *Family* Code. In § 24.601, the Government Code authorizes "family district court[s]," *id.* § 24.601(a); grants them "primary responsibility for cases involving family law matters," *id.* § 24.601(b); and emphatically insists that this jurisdiction be concurrent with other district courts, *id.* § 24.601(c) ("This subchapter does not limit the jurisdiction of other district courts nor relieve them of responsibility for handling cases involving family law matters.").

dividing property under this title retains continuing, exclusive jurisdiction . . . ." § 9.101. Other provisions within Subchapter B are equally clear. *See* §§ 9.104, 9.1045. Subchapter C's omission of any comparable "exclusive jurisdiction" language is thus especially striking.

*Something* unmistakable must be present to displace the strong presumption of jurisdiction. The Family Code generally achieves that goal with clear and express language of exclusivity, which is lacking here. Nothing else suffices to establish such exclusivity by implication. The dissent points to the statute at issue in *Thomas v. Long*, 207 S.W.3d 334 (Tex. 2006), as an example of when no "magic words" are required. *See post* at 9 n.21. That statute, however, "authorize[d] the [agency] to extend specified rights to employees *that are not available at common law*." 207 S.W.3d at 341 (emphasis added). That statutory feature warrants finding limited exclusivity there. But here, the opposite is true. A finding of exclusivity would eliminate the right to partition property, which is an historic "absolute right" as old as the Texas Republic—one that allows a jury trial, to boot. *See* Part II.A, *supra*; Parts II.C.4.a, II.D, *infra*. "We have consistently declined to construe statutes to deprive citizens of common-law rights unless the Legislature clearly expressed that intent." *ConocoPhillips Co. v. Koopmann*, 547 S.W.3d 858, 877 (Tex. 2018). We would be rewriting this statute if we imposed exclusive jurisdiction.

As to "continuing jurisdiction," Subchapter C is not even merely silent—it affirmatively points in the other direction. Section 9.201 makes clear that the divorce court's jurisdiction as to post-decree property division is *not* "continuing." To invoke the Subchapter C remedy, a former spouse must initiate new litigation subject to the rules

21

of procedure applicable to a new "original lawsuit." § 9.201(b). There is nothing inherently problematic in allowing a general district court to divide property solely because that property once was community property. Until Subchapter C provided an alternative, that was the *only* way to divide such former community property. As we must assume on S.C.'s jurisdictional challenge to M.B.'s suit, the former spouses were tenants in common like any other (non-married) tenants in common. Subchapter C does not change the parties' or the property's legal status, but simply authorizes dividing that property under a "just and right" standard that any district court can apply.[20]

In short, we cannot conclude that Subchapter C's omission of express language conferring exclusive or continuous jurisdiction was accidental. Nor can we see anything else to fill in the gap by implication.

**3**

Next, we are mindful of the presumption of consistent usage of the same words within a statute. *See, e.g.*, *Colorado County v. Staff*, 510 S.W.3d 435, 452 (Tex. 2017). Section 9.203(a) arguably uses the word "court" in a way that excludes any court other than the divorce court:

> If *a court* of this state failed to dispose of property subject to division in a final decree of divorce or annulment even though *the court* had jurisdiction over the spouses or over the property, *the court* shall divide the property in a manner that *the court* deems just and right, having due regard for the rights of each party and any children of the

---

[20] After all, to the extent necessary, the previous division, or any materials relevant to the divorce, will be available. The court likewise can consider any changes, too, including conduct like hiding the former community property at issue. *See Chu v. Hong*, 249 S.W.3d 441, 444–45 (Tex. 2008); *cf.* § 7.009 (addressing how to apply the just-and-right standard when there has been fraud on the community).

22

marriage.

§ 9.203(a) (emphasis added).  S.C. contends that "the court" refers exclusively to the divorcing court.  That reading carries some force, but the consistent-usage canon depends heavily on context.  "[M]ore than most canons, this one assumes a perfection of drafting that, as an empirical matter, is not often achieved. . . .  Because it is so often disregarded, this canon is particularly defeasible by context."  Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 170–71 (2012).

To be clear, courts should *begin* with the presumption of consistent usage and, all else equal, courts should end there too.  But all else is not equal here.  For example, the very next section in Subchapter C, which otherwise is structured like § 9.203(a), uses express language solely to remove any doubt about *which* court is being identified:

> If **a court** of this state failed to dispose of property subject to division in a final decree of divorce or annulment because **the court** lacked jurisdiction over a spouse or the property, and if **that court** subsequently acquires the requisite jurisdiction, **that court** may divide the property in a manner that **the court** deems just and right, having due regard for the rights of each party and any children of the marriage.

§ 9.204(a) (emphasis added).  The use of "that court" restricts the universe of courts to, literally, "that" single court *and no other*.

If § 9.203(a) had used the demonstrative adjective in the same way that § 9.204(a) does, we could more readily agree that § 9.203(a)'s remedy can be pursued only in the original divorce court.  Or if neither section had used "that," the consistent-usage canon would at least be harder to overcome.  But a rigid insistence on reading "*the* court" in

23

§ 9.203(a) to mean the same thing as "*that* court" in § 9.204(a) rubs against the surplusage canon. As the dissent acknowledges, only § 9.204(a) uses *that* to modify *court*, even though § 9.203(a) and § 9.204(a) otherwise "use a similar formulation" and structure. *Post* at 7. We cannot casually disregard the legislature's decision to provide this textual clarity *only* in § 9.204(a) when, if it intended the same meaning, it so easily could have done so in § 9.203(a) as well.[21] Our reading allows "the court" and "that court" to bear their normal English meanings. The statutory text, in other words, indicates that § 9.203(a) cannot overcome the presumption against jurisdictional exclusivity.

Moreover, we cannot conclude that § 9.203(a) uses "court" as a term of art that requires the exquisite consistency that would be necessary for us to find that the word "court" compels exclusivity. As Justice Story noted, the word "state" is used in at least four different ways in the U.S. Constitution itself, and in each instance, context reveals the correct meaning.[22] Likewise, "court" is not a specialized or technical term; "court" appears frequently in statutes describing the litigation process, and is used in at least five ways in Chapter 9 of the Family Code alone, each time providing guidance that is tailored to the context.[23] The

---

[21] The dissent illustrates how using "that" rather than "the" really *does* convey useful information: "In contrast, when a district court had jurisdiction and rendered the initial decree, . . . *that* court is *the* court that 'shall divide' the property." *Post* at 7 (first emphasis added). Particularly given how the legislature used "that" in § 9.204(a), its failure to do so in § 9.203(a) should not be so easily dismissed as meaningless.

[22] *See* Scalia & Garner, *supra*, at 171 (citing 1 Joseph Story, *Commentaries on the Constitution of the United States* § 454, at 323 (2d ed. 1858)).

[23] The divorce court, *e.g.*, § 9.001; possibly a court other than the one that rendered a divorce decree, § 9.103; a court that renders a qualified

context of § 9.203(a) is the new lawsuit that § 9.201 authorizes. "[T]he court" in the second half of § 9.203(a) describes the tribunal that may adjudicate the divorced couple's *new* dispute—about dividing property that they still jointly own *because* they did not divide it in the divorce court (which is the "court" referred to in the first half of § 9.203(a)). Further illustrating that "the court" need not inexorably refer only to the original divorce court, its use in § 9.203(a) plays a distinct role—it confirms that it really is *the court*, and not a *jury* (and perhaps a slate of court-appointed commissioners, *see* Tex. R. Civ. P. 761) that must conduct the division.[24] To identify "the court" that has this authority in any one case, we must turn to § 9.201, which creates the cause of action.[25]

---

domestic relations order, § 9.1045; a court of another state, § 9.203(b); and a court of this state vis-à-vis a foreign court, *id.*

[24] The dissent contends that our refusal to embrace its exclusive-jurisdiction reading means that "the designation of a particular court to hear such a claim, is completely unnecessary." *Post* at 6. To the contrary, our analysis gives important meaning to every word in the statute. The antecedent conditional ("If . . . the property") defines the set of cases to which § 9.203(a) applies. "[T]he court" then ensures that a court, not a jury, decides the division. "[S]hall divide . . . just and right" provides the substantive rule of division, analogous to § 7.001. The rest of the provision, including requiring recognizing children's interests, accounts for obligations such as those in Article XVI, § 15, of the Texas Constitution.

[25] Section 9.201(b) provides that, "*Except as otherwise provided by this subchapter*, the suit is governed by the Texas Rules of Civil Procedure applicable to the filing of an original lawsuit." (Emphasis added.) The language of § 9.204(a) *does* limit the "court" to the one that previously lacked but now has acquired jurisdiction. That express language satisfies the exception in § 9.201(b)—it is an *exception* because it describes the single court as alone being empowered by that subsection. Section 9.203(a), by contrast, lacks any such direction, thus leaving intact the default under § 9.201.

**4**

Again with some force, S.C. urges application of another important canon—that the specific prevails over the general. M.B. disputes that Subchapter C is more "specific" than Property Code § 23.001. We agree with S.C. (and the dissent, *see post* at 17–18) that Subchapter C is "specific" and Property Code § 23.001 is "general" when it comes to dividing a divorced couple's undivided property. The general-specific canon, however, does not warrant eliminating Property Code partition actions or making the divorce court's jurisdiction exclusive. But the canon *does* confirm that courts must choose § 9.203(a) as the rule of decision in cases involving post-decree property divisions when "*[e]ither* former spouse," § 9.201(a) (emphasis added), invokes Subchapter C. When that happens, *any* court "shall" apply the specific "just and right" standard, § 9.203(a). We address both aspects of the general-specific canon.

**a**

The general-specific canon does not require or even authorize altogether eliminating Property Code § 23.001. The premise of the canon requires more than the *existence* of a "specific" and a "general" provision. Rather, the two enactments must also be "conflicting provisions [that] simply cannot be reconciled," thus requiring the displacement of the general enactment when the specific one applies. Scalia & Garner, *supra*, at 183. Only if Subchapter C and Property Code § 23.001 were irreconcilable, or if Subchapter C would be rendered surplusage merely by the existence of the general partition remedy, could we find that the specific enactment has displaced the general. *See, e.g.*, *Graphic Packaging Corp. v. Hegar*, 538 S.W.3d 89, 97–98 (Tex. 2017); *In re Mem'l*

26

*Hermann Hosp. Sys.*, 464 S.W.3d 686, 716 (Tex. 2015).

These statutes are not irreconcilable either in text or in practice. Both Family Code § 9.201 and Property Code § 23.001 use the permissive "may" when describing the causes of action with no textual indication that either is the exclusive means to partition property. Neither statutory option is merely a subset of the other. The substantive standards, statutes of limitations, and access to a jury, for example, are all different:

- In a partition action, the owner takes his proportionate share of the property, *see* Prop. Code § 23.004(a), whereas Subchapter C applies the equitable "just and right" standard that would have applied in a divorce, *see* § 9.203(a).

- There is no statute of limitations in a partition action (aside from the general availability of adverse possession), *see, e.g.*, *Hanrick*, 54 S.W. at 355, whereas Subchapter C adopts a two-year period, *see* § 9.202.

- In a partition, the parties have the right to a jury trial to resolve factual disputes, *see, e.g.*, *Payne*, 16 Tex. at 369–70; *Azios*, 653 S.W.2d at 112–14, whereas Subchapter C commits those questions to the authority of "the court," *see* § 9.203(a) ("the court shall divide").

- Attorney's fees are not separately authorized in a partition action, whereas Subchapter C specifically provides for discretionary fee shifting, *see* § 9.205.

The two statutes can harmoniously coexist.[26] One can imagine a

---

[26] While we do not opine on the soundness of any particular decision, we also note that the intermediate appellate courts repeatedly have read the two statutes to be harmonious rather than intractably irreconcilable. *See, e.g.*, *Mann*

27

scenario in which *both* parties prefer one option rather than the other. Many years may have passed from the divorce, for example. And perhaps the only thing that the parties contest is the amount of an offset that must be credited when splitting the property—who has paid more to maintain or insure or improve it. Perhaps neither party welcomes the uncertainty that would flow from a laborious, fact-intensive, and costly "just and right" division so long after the divorce. Perhaps both prefer to avoid dredging up stale but painful memories or rehashing who did what to whom and who deserves what from whom. The dissent would openly require all this dredging, and more, *see post* at 13–14, even if both parties *prefer* a Property Code partition.

The dissent notes that in cases (unlike this one) that involve real property, Property Code § 23.002(a) would require venue in a "district court of a county in which any part of the property is located." *See post* at 19 n.53. This could be "a county far from the court that heard the divorce, possibly to one spouse's extreme detriment." *Id.* at 19. Perhaps, but *everyone* who owns real property, not just former spouses, is subject to that law. That venue requirement has not seemed oppressive, particularly when partition litigation may be considerably more expeditious than a holistic just-and-right division. And mandating a return to the original divorce court could be to *both* spouses' "extreme detriment." Both could reside far from that county. These complaints

---

*v. Propst*, No. 05-19-00432-CV, 2020 WL 1472212, at \*9 (Tex. App.—Dallas Mar. 26, 2020, no pet.); *O'Carolan v. Hopper*, 414 S.W.3d 288, 313 (Tex. App.—Austin 2013, no pet.); *Bass v. Bass*, 106 S.W.3d 311, 316 (Tex. App.—Houston [1st Dist.] 2003, no pet.); *Bishop v. Bishop*, 74 S.W.3d 877, 879 (Tex. App.—San Antonio 2002, no pet.); *Mayes*, 11 S.W.3d at 448; *Phillips*, 951 S.W.2d at 957; *Burgess*, 893 S.W.2d at 90; *Carter v. Charles*, 853 S.W.2d 667, 671 (Tex. App.—Houston [14th Dist.] 1993, no writ).

28

seem primarily aimed at the possible inconvenience of *venue*—not jurisdiction. If venue is a problem, the legislature is perfectly capable of addressing it in this or any other context.

Nor is there any guarantee of countervailing benefits from insisting on exclusive jurisdiction. The dissent repeatedly invokes the personalized knowledge of the divorce "court," *e.g.*, *post* at 18–19 (contrasting that court and a different "court without . . . first-hand knowledge"); *id.* at 19 (comparing the divorce "court" with one "[u]nfamiliar with the facts and record"). But *judges*, not "courts," have knowledge of or familiarity with a particular record. We readily agree that returning to the same judge sometimes may provide great efficiency. We expect most parties to do so for the sort of quick-fix post-decree division of newly discovered undivided property, which is when Subchapter C is especially helpful. *Both* parties—even if it only takes one to file—are likely to find it advantageous to return to that judge. But they may not be able to guarantee access to the same judge no matter how soon they seek to return.[27] And as time passes, any judge's memory of a particular divorce is likely to fade—if the judge is even still sitting. It can take well over a decade following divorce for some parties

---

[27] To take but two examples, see, *e.g.*, *Irick v. Lineberry*, No. 01-20-00232-CV, 2021 WL 5829096, at *3 (Tex. App.—Houston [1st Dist.] Dec. 9, 2021, pet. filed) ("The new year brought a newly elected judge to the trial court. Until then, the divorce, the post-divorce suit, and the summary judgment were all ruled on by the same trial judge."); *In re Martinez*, 478 S.W.3d 123, 124 (Tex. App.—Houston [14th Dist.] 2015, no pet.) ("In March 2013, [the] husband, filed a petition for divorce. Several months later, on November 18, 2013, . . . a visiting judge, dismissed the case for want of prosecution.").

29

to seek to divide the property.[28]  The dissent observes that a successor judge may take notice of the court's records, *post* at 20 n.54, but so can *any other* judge.  *See, e.g.*, *Freedom Comms., Inc.*, 372 S.W.3d 621, 623 (Tex. 2012) (citing Tex. R. Evid. 201).  Nor will those records necessarily be a panacea.  In this very case, a key document—the agreement incident to divorce—"is not filed with the records of [the divorcing] Court," according to that very court's decree.

Moreover, if Subchapter C is truly jurisdictionally exclusive, then every Texas court (including this Court) would be duty-bound to dismiss *sua sponte* a partition action (or even a § 9.203(a) action brought in a court other than the divorcing court).  Courts always have the duty to ensure that subject-matter jurisdiction—their own and that of the lower courts—is secure.  *See Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 445–46 (Tex. 1993).  Adding further uncertainty, any partitions that did not take place in the divorce court would become vulnerable to a *true* collateral attack.  *Engelman Irrigation Dist. v. Shields Bros.*, 514 S.W.3d 746, 750 (Tex. 2017); *see supra* note 15 (describing this consequence of the dissent's approach).

**b**

The absence of special jurisdictional consequences in Subchapter C, however, does not mean that the general-specific canon plays no role whatsoever in cases involving post-decree property divisions.  When a former spouse asks a court to divide specific property, after all, the court

---

[28] *See, e.g.*, *Evans v. Jones*, No. 11-19-00008-CV, 2020 WL 7414162, at *1–2 (Tex. App.—Eastland Dec. 18, 2020, no pet.) (twenty-two years from annulment to partition); *Kadlecek*, 93 S.W.3d at 905 (fifteen years from divorce to partition under Subchapter C); *Naydan v. Naydan*, 800 S.W.2d 637, 641 (Tex. App.—Dallas 1990, no writ) (same).

must be able to apply a single rule of decision. Two competing claims to the same property cannot be resolved separately. The property must be divided and can only be divided once, which is why a court historically has been able to maintain exclusive jurisdiction when a "*res*" is the subject of litigation. *See, e.g.*, *Kline v. Burke Constr. Co.*, 260 U.S. 226, 229–30 (1922); *First S. Prop. v. Vallone*, 533 S.W.2d 339, 342–43 (Tex. 1976).[29]

The task of division is easy if both parties agree on the approach or if only one party pursues the litigation. But if a court with jurisdiction to divide property confronts a valid claim for a partition by one spouse and a valid counterclaim under Subchapter C by the other (or vice versa), the court will avoid intractable conflict by applying Subchapter C, because the specific prevails over the general.[30] If what S.C. wanted was a just-and-right division, nothing precluded him from invoking § 9.203(a).

Viewing the two statutes in this light avoids imposing improper jurisdictional consequences *and* avoids placing the courts in the confounding position of having to divide the same property under

---

[29] A party who wishes the court to divide the property in a different way, therefore, should file a counterclaim in the court that has taken jurisdiction. If the party prefers a different *venue*, the ordinary rules governing venue would apply, but no such question is before us.

[30] Notably, neither party advances the argument that any court other than the divorce court can entertain an action under Subchapter C. We readily credit both sides for giving their best construction of the statute. But their interests on this particular point are less adverse than as to the rest of the case. Petitioner wishes to litigate the matter only in the divorce court and without any shadow of a partition action. Respondent wishes to litigate only in the non-divorce district court, and only for a partition, which is inconsistent with giving the district court authority to proceed under the "just and right" standard.

31

different substantive rules.[31]  This resolution also should eliminate the serious concerns that motivated Chief Justice Sudderth's dissent. Understandably, she found repelling the notion that a spouse could hide property, wait for the divorce to become final, then obtain an equal split via a partition action in a new court, rather than a "just and right" division in the divorce court.  Today's dissent likewise worries that even authorizing the possibility of a Property Code partition "provides an incentive for embittered parties" to wait for a final decree and then sue for partition.  *Post* at 18–19.

But our holding eliminates that incentive.  A spouse's effort to avoid Subchapter C will fall flat if the other spouse invokes it.[32]  Any court with jurisdiction must apply the "just and right" standard if, as § 9.201(a) expressly puts it, "*[e]ither former spouse*" asks for it.  (Emphasis

---

[31] Our resolution also eliminates any superficial conflict, so there is "no repugnance." *Waffle House, Inc. v. Williams*, 313 S.W.3d 796, 815 (Tex. 2010) ("This case . . . concerns implied statutory preemption of a common law claim, something our jurisprudence disfavors absent clear repugnance between the two.") (quotations omitted); *contra post* 15. *Compare Waffle House*, 313 S.W.3d at 815–16 ("Because in *Zeltwanger* the TCHRA covered the same emotional damages caused by essentially the same conduct, we held that there was no remedial gap to fill.  Here, by contrast, Williams's negligence claim is based on assault, a well-established common law tort." (citation omitted)), *with* Part II.D, *infra* (explaining how eliminating Property Code § 23.001 for post-decree undivided property would leave remedial gaps).

[32] The dissent in the court of appeals described as "absurd" a holding that did not confine *subject-matter jurisdiction* to only the divorce court.  But the law until 1987 *mandated* a partition in cases like this one, absent a showing of extrinsic fraud.  The 1987 statute greatly mitigated the problem of former spouses being unfairly forced to use partitions, but it is not absurd for a legislative enactment to reduce yet not wholly eliminate concerns with existing law.  The legislature, and not the courts, must decide how far to go and at what speed. *Rodriguez v. United States*, 480 U.S. 522, 526 (1987) (per curiam).  Happily, on our understanding of the text, even the seeming absurdity turns out to be largely illusory.

added.) Our statutory analysis seeks to accurately construe the text, not to avoid a particular outcome—but an accurate construction frequently eliminates consequences that otherwise might seem troubling. Our construction should deter the egregious gamesmanship that may have plagued divorces in the past, and a court that perceives an attempt to dodge the just-and-right standard will be well equipped to respond forcefully.

## D

Finally, we note several problems that our statutory construction avoids. We start with the right to a jury trial, which has always been guaranteed for any factual disputes attending a partition. We assume without deciding that the legislature *can* draw former spouses back into the non-jury-trial regime. Without clearer text, though, we find it hard to imagine that the legislature would *mandate* the wholesale elimination of both the ancient right to a traditional partition[33] and the role of the jury even when both sides desire such a partition and a jury trial. Finding Subchapter C to be the exclusive remedy and the divorce court to be the exclusive forum, however, would automatically sweep away those important features of existing law.

Perhaps even more serious, reading Subchapter C in that way would require us to conclude that the legislature has eliminated some property rights altogether. If one former spouse "unequivocally repudiates" the other's ownership interest at any point, then a two-year clock begins to tick. § 9.202. If Subchapter C is truly exclusive, then at the conclusion of that two-year period, the spouse in possession effectively

---

[33] *Ellis*, 17 Tex. at 133–34.

33

has adversely possessed the other spouse's undivided property interest. Subchapter C is a seeming *expansion* of solicitude for former spouses; it would be surprising for it instead to *sub silentio* create, uniquely harming former spouses, a two-year adverse-possession statute—a shorter period than all the adverse-possession statutes in the Civil Practice and Remedies Code. *See* Tex. Civ. Prac. & Rem. Code §§ 16.024–16.028 (the *shortest* adverse-possession limit is three years).[34] We again think the legislature would speak directly and clearly if it intended such a striking result, particularly given that all these rights—the remedy of partition itself, the right to a jury trial, and the fundamental right of property itself—are among the most important in Texas law.[35]

By contrast, our reading entails no such drastic or surprising consequences. Because Subchapter C is not exclusive, § 9.202's statute

---

[34] Under the dissent's approach, adverse possession (or at least the *consequences* of adverse possession) would take place even sooner than that. The dissent refers to "a former spouse bring[ing] a challenge within the proper time frame," *post* at 10, but there *is* no time frame other than the expiration of two years *after* "a former spouse unequivocally repudiates the existence of the ownership interest of the other former spouse," § 9.202(a). As to the problem of determining ownership of undivided property, the dissent just says that "[a]t some point courts must look beyond the perpetual assertion of an unrecorded community interest—to a contract, deed, or other relevant evidence—to determine ownership." *Post* at 17 n.48. What constitutes "some point," and how are courts supposed to use "relevant evidence" to wipe away one spouse's property interest? These questions go unanswered, and perhaps are unanswerable—but our reading of the statute wholly avoids them.

[35] *See Wright*, 7 Tex. at 533 (applying the remedy of partition to a divorce decree in 1852); *Gen. Motors Corp. v. Gayle*, 951 S.W.2d 469, 477 (Tex. 1997) ("The right to jury trial is one of our most precious rights, holding 'a sacred place in English and American history.'") (quoting *White v. White*, 196 S.W. 508, 512 (Tex. 1917)); *Eggemeyer v. Eggemeyer*, 554 S.W.2d 137, 140 (Tex. 1977) (recognizing the view of property rights "as fundamental, natural, inherent, inalienable, not derived from the legislature and as preexisting even constitutions").

of limitations simply means that, two years after an "unequivocal repudiation," the legislature deems a divorced spouse to have forfeited access to any post-decree "just and right" determination. The underlying property interest itself would not be extinguished. Nor could the former spouse who repudiated the property interest claim any unfairness. If the spouse who repudiates the other spouse's interest wishes to avail himself of Subchapter C as an alternative, he should bring suit under it, which would not prevent his ability to argue that the other spouse has no cognizable interest in the first place. But if the two-year post-repudiation period passes without *either* spouse having invoked Subchapter C, then neither spouse may *ever* do so. Both of them (and anyone to whom they may assign their interest) remain free, however, to use the Property Code partition action to the same degree they could have before Subchapter C was enacted.[36]

We note that the dissent's position would not avoid any of these problems. It would, in fact, engender even more. Take, for example, the problem that would arise if one former spouse—now a tenant in common—transfers her interest to someone else, whether by sale, death, gift, or otherwise. Subchapter C expressly limits its reach to "[e]ither former spouse," § 9.201(a), not to anyone who might wind up in a chain of title.[37] But if former community property can *only* be divided in the

---

[36] The Fourteenth Court has already used the Property Code as a backstop after the limitations had run under Subchapter C's predecessor. *Carter*, 853 S.W.2d at 671 ("Still further, even if § 3.90 applied to bar an enforcement action under the Family Code, that section would not operate to bar an otherwise valid partition action under the Property Code.").

[37] The dissent claims that the Business Organizations Code governs the partnership interest divided by divorce. *Post* at 16 n.44. We take no position on that question because on this plea to jurisdiction we must assume that the

35

original divorce court and *only* under Subchapter C, what happens if no former spouse can bring the action? Must the property remain in suspended animation—an eternal tenancy in common, at least until one party can buy out the other(s)? Or does the suspended animation end, as the dissent provides, in adverse possession? What sort of cloud on the title to the property would be occasioned by such a scenario? Or would the partition action spring back to life as soon as interests in the tenancy in common are transferred to someone else? Could it truly be the case that the legislature—with the force of *subject-matter jurisdiction*—intends to lock former spouses into a just-and-right regime even if neither of them wants it, yet gladly restores access to partitions by the simple expedient of a property interest being transferred? Would transferring only a small portion be enough? Or could the former spouses create wholly owned entities to receive title to the property—and then those entities could pursue the desired partition?

These questions may seem silly. But giving Subchapter C jurisdictional import would guarantee that such issues would arise. Our simple reading of the legislature's work avoids them all.

### III

We hold today only that the statute that the legislature has passed does not mandate any requirements beyond those expressed in the statutory text. The statute as written is a gracious remedial expansion by the legislature, and we are authorized to do nothing more than apply that statute. To put it mildly, we do not "discard[] the Legislature's prerogative" to do anything. *Post* at 2. We do not "adopt

---

partnership interests *were not* divided. *See supra* notes 1, 17. The district court will be free to examine this question on remand.

36

[our] own" way to divide property. *Id.* at 15, 16 n.47. We do not "undo[] the Legislature's work." *Id.* at 17.

The legislature remains free at any time to adjust Subchapter C in any way that it deems proper. If the legislature does revisit Subchapter C, it is likely to modify it only after undertaking the same careful analysis and consultation with the bar, the public, and other stakeholders that led it to enact the 1987 statute in the first place. Any modifications it enacts are likely to account for—and avoid—the myriad of problems that would flow if this Court were to insist on imposing jurisdictional consequences on the current version of Subchapter C.

We affirm the judgment of the court of appeals and remand the case to the district court for further proceedings. We express no views about any remaining issues between the parties.

Evan A. Young
Justice

**OPINION DELIVERED:** June 17, 2022

37